IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AGUSTIN Q., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | No. 18 C 7416 |
| v. | ) | |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner | ) | |
| of Social Security, [1] | ) | |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Agustin Q.,[3] applied for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") in 2014, alleging he became disabled on July 1, 2010, when he was 38 years old. (R. 21.) After a hearing, an administrative law judge ("ALJ") issued a written opinion denying his applications for benefits. The Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1), making the ALJ's decision the final decision of the Commissioner.

---

[1]The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On December 21, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 21.)

[3]The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield Unites of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants are not anonymous litigants, in that their names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

*Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Plaintiff seeks remand of the Commissioner's decision denying his applications for benefits (D.E. 16), and the Commissioner has asked the Court to affirm the decision. (D.E. 22.) The matter is now fully briefed.

**I.     Administrative Record**

Plaintiff received treatment from various medical providers at SU Salud Medical Center in Cicero, Illinois and occasional emergency room visits. The medical record begins in July 2012 with normal x-rays of Plaintiff's left hip and knee, despite pain. (R. 354.) The following year, in June 2013, thoracic and lumbar imaging showed degenerative changes but no acute findings, despite Plaintiff's lower back pain. (R. 362.) On July 12, 2014, Plaintiff underwent a state agency consultative medical examination. He reported sleeping a lot but still feeling fatigued. (R. 330.) The examiner noted he was obese at 69 inches tall and weighing 309 pounds, and his lungs were significant for decreased breath sounds. (*Id.*) Plaintiff had moderate difficulty squatting, mild difficulty walking on his toes, and decreased sensation to vibration at his toes, but he had a normal gait and normal range of motion in all joints except his knees. (R. 331.) On July 24, the non-examining state agency reviewer opined Plaintiff had the physical residual functional capacity ("RFC") to perform light work, occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; and stand, walk and sit about six hours in an eight-hour work day with some additional postural limitations. (R. 92-94.)

On July 23, 2014, Plaintiff underwent a state agency consultative mental status evaluation. Plaintiff reported hearing voices and having trouble sleeping; he had been taking the antidepressant Zoloft. (R. 346-48.) The examiner noted that Plaintiff's mood and affect were somewhat flat and he was "somewhat . . . intellectually limited" and had "some memory issues." (R. 348, 350.) On

2

August 5, 2014, the non-examining state agency mental health reviewer opined that Plaintiff had an affective disorder that caused mild limitations. (R. 90.)

At a doctor's visit on July 28, 2014, Plaintiff reported continued lower back and hip pain (R. 421), and he underwent an MRI of his lumbar spine on August 5, 2014. The MRI showed disk herniation at the L4-5 that was causing "severe stenosis of the spinal canal and mass effect on the transiting L5 nerve," and mild degenerative changes at other levels. (R. 415.)

Throughout 2015, Plaintiff was prescribed Norco (a narcotic) for his back pain as well as 800 mg of ibuprofen. (R. 411-12, 510, 515, 619.) A July 2, 2015 MRI of Plaintiff's lumbar spine showed no change from his previous MRI. (R. 450.) In August 2015, after reviewing additional medical evidence provided by Plaintiff on reconsideration, non-examining state agency physicians affirmed the previous year's state agency physical and mental RFC opinions. (R. 108-16.)

Plaintiff reported worsening back pain in 2016. In June 2016, in addition to Norco and ibuprofen 800 mg, Plaintiff was taking gabapentin, a nerve pain medication. (R. 503.) Plaintiff was also taking medication for diabetes, hypertension and hypercholesterolemia, and he continued to take Zoloft for depression. (*Id*.)

In August 2016, Plaintiff went to a rehabilitation hospital for treatment of his lower back pain. He described the pain as alternating between sharp and throbbing; the pain extended down his bilateral lower extremities. (R. 433.) Plaintiff also complained of bilateral foot numbness and tingling, which he attributed to his diabetes. (*Id*.) The physician observed that Plaintiff had some difficulty going from a sitting to standing position, tenderness in his lumbar spine, his gait was slow and cautious, lumbar flexion was slightly decreased, lumbar extension was significantly decreased and straight leg test was positive bilaterally (indicating lower back pain). (R. 434.)

On August 19, 2016, Plaintiff received a lumbar epidural injection for his lumbar radiculopathy (nerve pain) and spinal stenosis. (R. 453.) However, at a doctor's visit the following day, Plaintiff reported that he did not feel any change with the injection. (R. 498.) His doctor added a prescription for Flexeril (a muscle relaxant, once a day) in addition to ibuprofen 800 mg (three times per day) and Norco (every six hours, as needed). (R. 499.)

On September 24, 2016, Plaintiff visited his doctor "for follow up of low back pain with sharp needle like pain and tingling and numbness of both legs." (R. 496.) Plaintiff reported difficulty sitting or standing for more than 30 to 40 minutes at a time, and the doctor observed that he appeared uncomfortable when sitting and was constantly shifting. (R. 496-97.) In addition to his medications, the doctor recommended Plaintiff follow up with a pain clinic. (R. 497.)

On October 17, 2016, Plaintiff attempted to return to work driving a forklift, but he stopped working after six weeks because of back pain. (R. 489.) On December 10, 2016, Plaintiff rated his back pain as an eight out of 10 despite taking ibuprofen, Flexeril, gabapentin and Norco. (*Id*.) Plaintiff's physician told him to stop taking Norco. (R. 490.) At a follow-up medical visit in March 2017, Plaintiff continued to complain of severe back pain; his medications were not helping to relieve the pain. (R. 485.) Examination showed Plaintiff had lumbar muscle spasm, decreased lumbar range of motion, and positive bilateral leg raising test. (R. 485.) Plaintiff's physician gave Plaintiff a prescription for tramadol (a narcotic), in addition to his other medications. (R. 486.)

## II. Evidentiary Hearing

At the July 6, 2017 hearing before the ALJ, Plaintiff testified that he had tried to go back to work in October 2016 because he briefly felt better after his August 2016 lumbar injection. (R. 68.) However, he stopped working about two months later because he "couldn't take the pain anymore, [] of working." (R. 53.) Plaintiff testified that he had lower back pain that ran down both

4

his legs and sharp pain going down his left arm (*id.*); the pain lasted for hours every day. (R. 58.) Sometimes his medication helped relieve his pain, but at other times his back continued despite additional ibuprofen and tramadol. (R. 58-59.) Plaintiff took Flexeril morning and at night, which made him sleepy (R. 54), and he still felt tingling despite taking gabapentin. (R. 66-67.)

Plaintiff testified that he could walk slowly up to two blocks, sit for 45 minutes, and stand for about an hour (R. 59), but he had extreme pain after standing about 15 minutes. (R. 70-71.) His wife did all the housework; she also tied his shoes for him and sometimes helped him dress due to his back pain. (R. 61, 64.) Plaintiff used a cane (not prescribed) to help him walk and stand straight (R. 61); he used his hands to lean on something when he stood up from a sitting position. (R. 72.)

The vocational expert ("VE") testified that Plaintiff's past work included assembly line hand packager and forklift operator. (R. 75.) The VE stated that no light work would be available for a person who needed to sit or stand alternately at will. (R. 78.) Regarding sedentary jobs with a sit/stand option, the VE testified that, in his experience (as the Dictionary of Occupational Titles does not discuss sit/stand options), there were "bench jobs" available, ". . .but with a caveat. And that is that if a person has to change positions from sitting to standing or standing into sitting any more than four or five times an hour on a regular hourly basis, then that would be a significant impediment to doing the job." (R. 78-79.) In addition, that person's off-task time should not exceed six minutes per hour in addition to normal breaks. (R. 80.) Plaintiff's attorney clarified that a person who needed to lean on both hands while standing would be off task while standing. (R. 81.)

### III. ALJ's Decision

On December 6, 2017, the ALJ issued a written opinion finding that Plaintiff was not under a disability within the meaning of the Social Security Act from his alleged onset date of July 1, 2010, through the date of the decision. (R. 22.) At Step One, the ALJ found Plaintiff had not

5

engaged in substantial gainful activity during this time period. (R. 23.) At Step Two, the ALJ found Plaintiff had the following severe impairments: lumbar spinal stenosis, lumbar radiculitis with disk herniation, and peripheral neuropathy. (*Id*.) The ALJ determined Plaintiff's diabetes and morbid obesity were not severe because they did not cause more than minimal limitations in his ability to function. (R. 24.) In addition, the ALJ found that Plaintiff's mental impairment did not cause him any limitations; the ALJ recognized that Plaintiff reported feeling agitated, depressed and hearing voices but noted he "did not seek any mental therapy." (*Id*.) At Step Three, the ALJ found Plaintiff's impairments did not meet or medically equal the severity of a listing. (R. 24-25.)

Next, the ALJ assigned Plaintiff an RFC to perform sedentary work provided he could: sit and stand at will without being off task, operate foot controls occasionally and hand controls with his right hand frequently; and stoop, kneel and crouch occasionally. (R. 25.) In addition, Plaintiff had to avoid concentrated exposure to heights, hazardous machinery, pulmonary irritants, extreme cold and very loud noise, and his time off task, in addition to normal breaks, could be no more than 10 percent of an eight-hour workday with a maximum of 10 absences per year. (*Id*.)

The ALJ then reviewed the medical evidence. He acknowledged Plaintiff's August 2014 MRI showed severe stenosis and Plaintiff took Norco for pain in 2015, but the ALJ pointed out that Plaintiff had normal gait and no motor deficits in October 2014 and a June 2013 spine x-ray showed no significant degenerative changes. (R. 26-27.) The ALJ reviewed the July 2014 state agency exam documenting Plaintiff's limited ability to squat and flex his knee but noted that Plaintiff otherwise had normal range of motion and gait and his knee x-rays were unremarkable. (R. 26.) The ALJ also recognized that Plaintiff reported worsening daily back pain in 2016, and that testing in the second half of 2016 showed decreased lumbar flexion, slow gait, positive straight leg-raising test, and difficulty moving from sitting to standing. (R. 27.) In August 2016, Plaintiff

6

received a lumbar epidural steroid injection, and the ALJ found it "notabl[e]" that in December 2016, Plaintiff reported it had "helped a little bit" and he had "returned to working as a forklift driver" from October 17, 2016 until November 28, 2016. (R. 27.) However, the ALJ recognized that at the December 2016 doctor's visit and again in March 2017, Plaintiff had lumbar muscle spasm, limited range of motion and positive leg raising despite taking medication for the pain. (*Id*.)

The ALJ concluded there were "significant inconsistencies" between Plaintiff's allegations of constant fatigue, chronic back and knee pain, and depression and a "lack of objective findings to support the degree of limitation alleged." (R. 26.) The ALJ found Plaintiff "sought rare, intermittent treatment for these alleged impairments" and "has generally not received the type of treatment one would expect for a person suffering from the degree of pain and limitation contended, as the record reflects routine and conservative treatment recommendations." (R. 26-27). In addition, the ALJ noted that Plaintiff "continued to work, and did not exhibit the significant degree of physical limitation he alleged." (R. 27-28.)

Finally, at Step Four, the ALJ found Plaintiff was unable to perform his past work. (R. 28.) However, at Step Five, the ALJ concluded that based on the VE's testimony, Plaintiff could perform a significant number of other jobs in the national economy. (R. 29.)

**IV.   Analysis**

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal citations and quotations omitted). "An ALJ need not address every piece of evidence, but he must establish a logical connection between

7

the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

Here, Plaintiff contends the ALJ's decision should be remanded for several reasons. The Court agrees with Plaintiff that the ALJ's adverse credibility determination was not supported by substantial evidence, and the ALJ failed to properly evaluate Plaintiff's RFC. We remand on these bases and do not reach Plaintiff's additional arguments for remand.

### A.     The ALJ's Inconsistent RFC Determination

The ALJ assigned Plaintiff an RFC to perform sedentary work provided he could sit and stand at will without being off task, in addition to other limitations. (R. 25.) Plaintiff argues that the ALJ's determination that he could "sit and stand at will" -- with no limitation on the number of position changes -- means, according to the VE's testimony, that he was disabled. (Pl.'s Br. at 6.)

The Court finds that the ALJ's RFC determination requires remand because it is inconsistent with the VE's testimony and the remainder of the ALJ's opinion. The VE testified that if a person had to change positions from sitting to standing or standing to sitting any more than four or five times an hour on a regular hourly basis, that person would not be able to sustain full-time employment. (R. 78-79.) Despite stating that his opinion relied on the VE's testimony (R. 29), the ALJ proceeded to give Plaintiff an RFC that allowed him to sit and stand "at will," without any reference to a limitation on the number of times he could change positions. On remand, the ALJ must address this conflict between his opinion and the VE's testimony. *See Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) (remanding where the ALJ failed to support determination about how long claimant would be off-task).[4]

---

[4]     In his initial brief, Plaintiff argues that the ALJ erred in relying on the state agency RFC opinion from August 2015 because the state agency reviewer did not consider the August 2014 MRI showing severe stenosis. (Pl.'s Br. at

8

### B. The ALJ's Erroneous Adverse Credibility Finding[5]

#### 1. Legal Standard

The court "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). A credibility determination is patently wrong "when it relies on inferences that are not logically based on specific findings and evidence." *Id*. For example, the Seventh Circuit has overturned adverse credibility findings where an ALJ: "overstated test results and treatment recommendations and drew unjustified inferences from [a claimant's] medication gap and job search," *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018); "erroneously evaluated [a claimant's] symptoms and daily activities, misinterpreted medical evidence, and failed to ask why [the claimant] skipped some appointments," *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019); and rested an adverse credibility determination "on a misinterpretation of the medical records," *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018). Several of these errors are present in the ALJ's opinion at issue here.

#### 2. The ALJ's Misinterpretation of the Medical Record

The Court agrees with Plaintiff's contention that the ALJ failed to support his finding that Plaintiff's allegations were not entirely consistent with the evidence because "much of the [ALJ's]

---

5.) However, in his reply brief, in response to the Commissioner's argument calling this allegation into question, Plaintiff concedes that the August 2014 MRI was included in the materials before the state agency reviewing physician, and he has no evidence the reviewer did not consider this material, although the reviewer did not specifically mention it. (D.E. 23: Pl.'s Reply at 1-2.)

[5]The Court rejects Plaintiff's argument that the ALJ's use of the boilerplate language "not entirely consistent" to describe the credibility of his allegations changed Plaintiff's burden of proof or production and automatically necessitates remand. (Pl.'s Mem. at 10-11.) The fact that the "ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). Courts in this district, including this one, have repeatedly rejected the argument that this boilerplate language changes the claimant's evidentiary burden. *See Aitmus R. v. Saul*, No. 18 C 5735, 2019 WL 4923208, at *7 n.13 (N.D. Ill. Oct. 4, 2019) (collecting cases).

9

summarized evidence seemed only to support [Plaintiff's] allegations," including, among other things: the MRI showing severe spinal stenosis and disk herniation; Plaintiff's reports of severe back pain despite taking narcotic pain medication; examinations showing lumbar muscle spasms, limited range of motion, difficulty going from a sitting to standing position and slow gait; and prescriptions for narcotic pain medication. (Pl.'s Br. at 11-12, citing R. 26-27.) The ALJ failed to explain why this evidence did not support Plaintiff's allegations of severe and limiting pain. Instead, the ALJ focused on earlier imaging results that were unremarkable and examination results showing Plaintiff had normal gait and range of motion. (R. 26-27.)

The ALJ's analysis is inadequate. First, "none of [Plaintiff's] physicians interpreted these medical findings as inconsistent with his reports of recurrent and worsening pain and functional limitations. [His] physicians continued to treat his pain." *Lambert*, 896 F.3d 768 at 777. Second, the ALJ's reliance on earlier, normal testing and examinations "is misplaced because of the later evidence that [Plaintiff's] condition had become more painful." *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). The ALJ improperly "overstated findings" from early diagnostic tests and examinations "to discredit [Plaintiff's] complaints of pain." *Gerstner*, 879 F.3d at 264.

### 3. The ALJ's Misinterpretation of Plaintiff's Treatment and His Attempts to Work

The ALJ also determined that Plaintiff "has not generally received the type of treatment one would expect for a person suffering from the degree of pain and limitation contended, as the record reflects routine and conservative treatment recommendations. . . . " (R. 27.) The ALJ recognized that Plaintiff took narcotic pain medication and underwent a lumbar epidural steroid injection that was initially unhelpful. (*Id.*) However, the ALJ found it "notabl[e]" that in December 2016, Plaintiff reported the injection had "helped a little bit" and had "returned to working as a forklift driver." (*Id.*)

10

However, as Plaintiff points out, his attempt to work lasted just over one month and resulted in further back pain and injury. (Pl.'s Br. at 12.) This "unsuccessful attempt to hold a [] job" supports, rather than undermines, the credibility of Plaintiff's allegations of pain and resulting limitations. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). *See also Gerstner*, 879 F.3d at 265 ("a claimant who looks for work after claiming a painful disability may have a strong work ethic or overly-optimistic outlook rather than an exaggerated condition") (internal citations and quotations omitted).

In addition, the ALJ's determination that Plaintiff received only "routine and conservative" treatment and did not receive "the type of treatment one would expect for a person suffering from the degree of pain and limitation contended" was erroneous for several reasons. First, Plaintiff was consistently on a regimen of strong pain medication, but his pain was only minimally responsive to this treatment; even the epidural steroid injection, initially unhelpful, ultimately only "helped a little bit" to relieve his pain. The ALJ's failure to address the evidence that Plaintiff "continued to experience pain even when taking the medication" was error. *Lambert*, 896 F.3d 768 at 777. Second, Plaintiff's "pain complaints were consistent with [his] prescription[s]" for multiple narcotic and nerve pain medications, which are "not intended for mild or acute pain," *Gerstner*, 879 F.3d at 264-65 (discussing prescription for methadone), and thus "[t]he nature of [Plaintiff's] treatments bolsters [his] pain allegations and suggests that the ALJ's basis for labeling his treatment conservative was misguided." *Huber v. Berryhill*, 732 F. App'x 451, 456-57 (7th Cir. 2018) (holding that the ALJ "unreasonably minimized the extent of [the claimant's] treatment" despite "[t]he absence of recommendations for back surgery or narcotics"). Third, there is no mention in the record of any other "type of treatment" options Plaintiff could have pursued, and

11

the ALJ "inappropriately played doctor" by speculating that other, less conservative, treatment options were available for him. *See Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion to remand the Commissioner's decision denying her applications for benefits (D.E. 16) and denies the Commissioner's motion to affirm. (D.E. 22.)

       **ENTER:**

       **GABRIEL A. FUENTES**
       **United States Magistrate Judge**

**DATED: May 12, 2020**